Council will come forward in our second case, 12-2100. Guiton, I hope I pronounced that correctly, versus Colvin. Mr. Phillips, when you're ready, come on up and we'll be glad to hear from you. May it please the Court, my name is Michael Phillips and it's my honor to represent Mr. Guiton. I'll try to give you a quick overview and then I'll address each point in a little more detail. On adaptive deficits, there are two main reasons to rule in favor of Mr. Guiton. Number one is that we have presented evidence of deficits in nine of the 11 areas of adaptive functioning, and the ALJ simply did not evaluate this evidence. And number two is the decisions of this Court and other courts that find that people who are more functional than Mr. Guiton are nevertheless retarded. On the issue of onset before age 22, there are four main reasons to rule in our favor. Number one, Mr. Guiton repeated first grade before he had any excessive absences. Number two, in eighth grade, at age 15, he was reading at barely above premier level. Number three, when he was in his 20s, before... When we look at this particular issue, what standard of review are we exercising? Well, Your Honor, our ALJ here made both legal and factual errors. On the substantial evidence side, he didn't evaluate evidence of deficits in nine areas. But on the legal error side, he didn't use the correct definition of deficits in adaptive functioning because he looked at it as if you are functional in any area, then you don't have deficits. But the correct standard, the correct legal standard, is that if you have some deficits in some area, then you meet the definition. So he committed both legal and factual error. And also, when Mr. Guiton was in his 20s, he went to the Catawba County Association for Special Education. And this was before he had his three brain operations. So there's no allegation that his brain surgery might have affected him at that point in his life. Yet until then, he had never even been able to earn $10,000 a year. And after that, he was still only usually able to earn about $10,000 to $12,000 a year. The other error on this point is the ALJ actually made contradictory findings about whether the brain surgery affected his IQ. At pages 19 and 27 of the record, at one point, he said it's likely that the brain surgery did not affect his IQ. And at another point, he said it's likely that the brain surgery did affect his IQ. So just the contradiction in the ALJ's own findings is a reason for reversal there. On the VE job numbers, the vocational expert just couldn't say how she got from the census code, which included 1,687 occupations, not jobs, but occupations, to the numbers for the single occupations that she gave. What do you make of the magistrate judge's analysis that even giving your client the benefit of the doubt with respect to that issue, slicing off nine-tenths of the possible jobs, there are still a sufficient number of jobs available that would satisfy the criteria? Well, nine-tenths is off by about two orders of magnitude, Your Honor. One occupation out of 1,687 is not ten percent. It's about one-seventeenth of one percent. So even reducing it by 90 percent, you still need to reduce it by about two more orders of magnitude. So that's just not nearly adequate. The government cites a number of cases from across the country that appear to have accepted these same authorities, rendering the same statistical evidence admissible and acceptable, and it doesn't appear there's any court that's ever gone the other way. Is there? Your Honor, not that I know of, but two things on that. Number one, I do not think we can assume that we are dealing with the same evidence that those other courts dealt with. Those courts held that the OEQ, the Occupational Employment Quarterly, is reliable. We agree it's reliable, but the numbers that our vocational expert gave didn't come from OEQ. She might have started with the OEQ numbers, but she didn't end with them, and we don't know what the case was in those other cases. Those other cases held, the OEQ is reliable. As I said, we don't have any quarrel with that, and we don't know what the vocational expert testimony was in those other cases. The government also filed a letter with some supplemental authority pointing to some evidence in the record that they say really conducts the analysis that you complain is missing in this case. What about that? Several points on that, Your Honor. Number one, what the government is saying there is that even if the 2007 V.E. testimony that the ALJ relied on is no good, it's harmless because the 2005 V.E. that the ALJ did not rely on identified one of the same jobs, and the numbers of that one job, that one occupation, were significant. And there are four problems with that, I believe. Number one, we think the government waived that argument by not making it in their brief in the first place. Number two, that's a post hoc rationale that violates the rule of Chenery. The ALJ didn't say he was relying on the 2005 V.E. The ALJ said he was relying on the 2007 V.E. This court should not come up with a better rationale where the ALJ's rationale is defective. Most importantly, probably, the 2005 methodology was no better. If you read the 2005 vocational expert testimony, well, she used more words, but she didn't add any more meaning. For instance, at page 471, this is the 2005 V.E. that the government has now raised testifying, she said, well, I can look at state statistics. But she didn't say that she actually did look at state statistics in this case. She didn't say what those state statistics said. She didn't say how she applied those state statistics to get to her result. At 472, she was asked, do these census code numbers that you're relying on include part-time jobs? And she said, I don't know. Well, the issue in a Social Security case, and this is Social Security ruling 96-8P, is whether a claimant can work eight hours a day, five days a week, or an equivalent work schedule. So whether her numbers include part-time jobs, that's a critical question. And she didn't even know the answer. At page 473, she was asked, well, do you have any labor market surveys to support your answer? And she says no. So, you know, the V.E. testimony in 2005 was a little longer, but it wasn't any better. And finally is the mathematical question that you raised a few minutes ago, is this one job that both vocational experts identified is bench assembler. And bench assembler is the one that the vocational expert testified, and this is at page 637 of the record, that the census code that includes bench assembler includes 1,687 occupations, not jobs. Occupations. And she couldn't say, how do you get from the number for the 1,687 occupations to the number of jobs in this one occupation?  And, again, this is a Step 5 case. The burden is on the ALJ. And so I think, Your Honor, the Supreme Court in Richardson v. Perales held that a Social Security claimant has a due process right to subpoena and cross-examine an expert witness. And that right doesn't mean anything if the answers don't matter. And we don't ask for a Daubert standard. We have not relied on Daubert. We do not cite Daubert. But we ask for some methodology that can be checked by counsel, can be checked by other experts. And just to say, based on my experience, I have a hunch it's not a methodology that anybody else can check. And that's not an answer that matters, allowing that kind of testimony would gut Richardson v. Perales. Let's see. On the onset before age 22, the ALJ relied mostly on the fact that, yeah, they always said his reading was satisfactory. And, in fact, at one point in the 8th grade, they even said his reading was commendable. But, again, there he was reading barely above primer level. And the only way that it could be satisfactory or commendable for an 8th grader at age 15 to be reading barely above primer level is if he's in special education, which he testified that he was several times in the record. And the DSM-IV-TR says that the mentally retarded, by the time they hit their late teens, can usually achieve academic skills up to the 6th grade level. So, at that point, Mr. Guyton was underperforming even for the mentally retarded. So for the ALJ to cite that level of reading as a reason to find him not retarded, it's standing the facts on their head, Your Honor. Mr. Phillips? Yes. You know, I'm really troubled by this case on a number of different levels. It strikes me as such a close call. And so I wonder, how am I, as a United States Court of Appeals judge, supposed to wade into this? I think even you would concede. I'm not gonna ask you. It's a close call. And the magistrate judge had evidence that he's driving, he's living alone, he's engaged in activities, he's cutting the grass. I mean, there is substantial evidence here that he is able to live a reasonably functional, safe, one might even say ordinary life. Your Honor, two points on that. Number one, as we set out in the brief, 89% of the mentally retarded are not easily distinguished from other folks. They live and work in the community. But number two, you owe the court below and the ALJ no deference on legal standards. I understand that. I understand that. And you're right. De novo review of legal questions. But here, the intertwining of legal and factual questions, I mean, that's what substantial evidence really comes down to in many respects. I understand you've identified some discrete legal questions. But even you say, I mean, you concede. The federal rules of evidence don't apply here. Correct, Your Honor. You're not gonna get us to apply a Daubert standard. Oh, we do not rely on Daubert. Exactly, exactly. And so, right, so the magistrate judge, like the ALJ, kind of thought, you know... Your Honor, the legal standard is not that the mentally retarded must be a basket case, that they must have deficits in all areas. And you know I'm not suggesting that. Correct, Your Honor. The legal standard is that the person must have some deficit in some area. And there are 11 areas of adaptive functioning. And to say he doesn't have deficits in this two or three areas, therefore he doesn't have any deficits, that's fallacious legal reasoning, Your Honor, to which you owe the lower courts in the ALJ no deference. I believe I've used up my time. You have some time on rebuttal. Thank you, Your Honors. Mr. Valencia. Good morning. May it please the Court. My name is Jason Valencia, and I represent the Acting Commissioner of Social Security, Carolyn Colvin. I respectfully request that this Court affirm the decision of the District Court for the Middle District of North Carolina and find that substantial evidence supports the Commissioner's final decision for three reasons. First, substantial evidence supports the ALJ's finding that Listing 12.05c is not met in this case. Second, there is substantial evidence to support the ALJ's findings at Step 5.  the little weight the ALJ afforded to Mr. Bevis's opinions regarding Mr. Guyton's mental residual functional capacity. With regards to Listing 12.05c, this case turns on the first prong of that listing as outlined by this Court in Hancock. Specifically, a determination must be made whether or not Mr. Guyton has established significantly sub-average general intellectual functioning before age 22, and even if so, he must also establish deficit and adaptive functioning. The Commissioner submits that Mr. Guyton had established neither of those in this case. Well, you've got the adult IQ test. Yes, Your Honor, and this Court... And there's a presumption, right? Yes, but it's a rebuttable presumption, Your Honor. And how have you rebutted it? In this case, the ALJ rebutted the presumption by looking at the opinion of the same medical source that conducted the IQ test, who opined that the pre-morbid intellectual functioning in this case was likely between 71 and 84. And what's the basis for that opinion? He's a psychological medical source, so it was his... I would cite his own expertise. But that is not the only evidence that the ALJ relied upon. What other evidence is there in the record? In this case, the ALJ... That he suffered an IQ decrease? Not that he suffered an IQ... The only additional evidence the ALJ cited in this case was he looked at the school records in this case. And in this case, the school records reflected that when this individual put forth a sufficient effort and attended class, his grades were in the satisfactory... What about the first grade? The first grade, he did repeat. But the ALJ... He not only repeated, but he went to school. Yes, but the ALJ gets to weigh that evidence. And in here, as Your Honor pointed out, this is, at best, a close call. I think it's better for the government than a close call. But at best, from Mr. Guyton's position, it's a close call. And when we're talking about what the facts say and weighing that evidence, the ALJ gets to make that call. And here, I think that it aligns a lot with what happened in Hancock. In Hancock, the, um... the appellant spoke to their difficulties in school, and the ALJ focused, in that case, on the fact that the individual didn't go to school, and that contributed to their poor scores. The ALJ was able to make that call. So it's the government's contention that in a situation like this, the ALJ has a medical opinion as to the issue of premorbid functioning, and he has school records where the interpretation of those records, which that duty falls on the ALJ, was entirely reasonable in this case. But even if this court finds that the premorbid intellectual functioning was at a sufficient level to satisfy the listing prior to age 22, Mr. Guyton also must establish deficits in adaptive functioning. In here, the ALJ does a thorough job going through the educational evidence, his social activities, his activities of daily living, and his work history, all to establish that in this case there wasn't deficits in adaptive functioning. Do I understand counsel to argue that he says there are 11 data points? Yes. What's your understanding of that argument? My understanding of that argument... That if you can prove deficits in two out of 11,  I don't agree with that argument. What's your take on it? Nothing in the listing sets that type of standard. The listing simply says that deficits pluralizes, so that deals with Mr. Guyton's argument regarding only having to establish any deficit in any area of adaptive functioning. But there is nothing in the listing that talks about the need to establish 2 or 3 or 4. It's left open for the ALJ to determine what are deficits in this particular case. I think that's because what justifies as deficits in a particular case is going to change based on the facts of a particular case. This is a good example. In this case, for example, Mr. Guyton has alleged that he can't cook, and he's alleged that he can't live independently. Now, at first blush, those are deficits in adaptive functioning. But on the facts, in this case, the reason that Mr. Guyton didn't live alone was not because of any intellectual disability. It was because he had seizures. The reason he didn't like cooking was because he once cooked, had a seizure, and burned himself. So the idea that all you have to do is cite to any deficit and make your own subjective testimony is going to be enough to satisfy the listing and handcuff the ALJ, I think that's a flawed approach. I think what happened here mirrors in great deal what type of evidence the ALJ was faced with in Hancock. If this court looks at its decision in Hancock, it can see that the ALJ focused on similar activities of daily living as the ALJ focused in this case. Mr. Guyton's brief makes point of the fact that he alleged that he had difficulty paying bills, and he does make that assertion, but the ALJ noted that he was able to use an ATM. And if that was the only thing the ALJ relied upon, Mr. Guyton would have a better case. But I think in this situation, where the ALJ has the duty and not this court to weigh the evidence, and the ALJ has made a fair weighing of that evidence in line with what this court said was appropriate in Hancock, I think that this court should not overrule what the ALJ's well-supported findings were. Moving on to the vocational experts' testimony. In this regard, the commissioner viewed the appellant's initial brief as challenging the reliability of the OEQ, and this was the same challenge that was made to the district court, and that is why our initial brief focused on establishing case law that showed that the OEQ was a source that VEs typically rely upon and could rely upon in this case. During the initial argument, Mr. Guyton's counsel has conceded that they don't challenge that. The OEQ is a private publication, is that right? Yes, Your Honor. It relies on government publications of different statistical factors, is that correct? Yes, Your Honor. And that is one of the reasons that courts have given for why it is a reliable source, because even though it's a private publication, it relies on government publications, and more so the fact that VEs routinely rely upon it as a reliable source. Here, what we're left with now is a challenge to whether or not the actual number of jobs in this case is substantial. And the primary challenge is to the 2007 vocational experts' testimony, and admittedly that vocational expert did not reduce down the numbers that the OEQ provides to reflect what availability there were for the specific jobs that she identified. Now, the major reason that this VE didn't do that and that no VE does that is because in today's world those numbers aren't maintained. It used to be a long time ago that census data was collected for each individual occupation. We knew on a regional and national level how many specific jobs were available for every single DOT occupation. It's not how it's collected anymore. Now they're collected by groups of similar jobs. So this court should recognize that, as the district court did, that even though it's the commissioner's burden at step 5, what Mr. Guyton would ask that burden to require is something that can't be done because nobody maintains those numbers. Now, I suppose this court could require vocational experts to somehow go out and research and maintain those precise numbers, but I would submit that that is too large a burden. Well, who imposes the requirement at step 5? That's a regulatory requirement, right? Well, the requirement and the burden is on the commissioner. A burden that's defined by whom? By regulation or by statute? Yes, Your Honor, but with the language that they have to provide evidence of a substantial number of jobs. So why does the statute and regulation define it in a way that makes it impossible for the government to meet its burden, literally? It's only impossible based on what this court would view as the burden to be. If the court requires that... If the court were to require that there has to be numeric precision on the availability of jobs that the VEs testify to, well, then I would suspect that if this court did that and then additional circuits followed suit, I don't think it would be long before Congress would change the regulatory requirements. But I don't think that that is necessary because I think what we have here is a situation where we're relying on vocational experts. We can't do much right now about the way data is collected. And the reason that we are citing to the 2005 VE testimony and citing the Supreme Court's decision in Shinseki allowing for the application of a harmless error doctrine to these administrative decisions is that in the 2005 testimony, that vocational expert, at least I believe, went through the type of analysis that Mr Guyton is requiring. That expert took a look at the same OEQ data but then explained that she reduced those numbers based on her own expertise and her own studies of what was going on with the job market in North Carolina. Now, that has to be enough because Mr Guyton and similar claimants, they'll always be able to argue for more. And if the court is going to entertain that argument, the commission will never be able to satisfy its burden. And in this case, there's a lot of focus on the bench assembler job, and that is true. Both vocational experts cited bench assembler, but I would note that the 2005 vocational expert, in response to a hypothetical question, an RFC that mirrored the RFC presented for the 2007 vocational expert, identified three jobs. RFC, that's an acronym that means...? Residual Functional Capacity. So basically, the 2005 VE was offering testimony about three occupations that could be performed in substantial numbers that were available for the same RFC found in the most recent decision. So if this court's concern is that if this case went back, would a different VE have offered different testimony based on the findings of the current decision, that concern is solved by the fact that it was the same Residual Functional Capacity presented to the VE at the prior hearing. So moving on to the rejection or the little weight afforded to the opinion evidence provided by Mr. Bevis. Mr. Bevis made...offered an opinion regarding Mr. Guyton's Residual Functional Capacity, finding that Mr. Guyton will experience significant problems relating to fellow workers and supervisors due to his low intelligence and memory deficits. His tolerance for stress and pressure associated with work routine will significantly interfere with his work performance. The ALJ did not afford significant weight to that opinion because it was not supported by substantial evidence. And the reasons that the ALJ provided are well supported. The...Mr. Guyton relies on the case of Grimmett. I believe that case is not applicable here because in this case, unlike in Grimmett, the ALJ did not solely reject it based on his own interpretation of the evidence. In this case, the ALJ also relied on the state agency, medical source opinion, who, in fact, reviewed Mr. Bivins' findings and his exam report. So I believe that alone takes it out of the Grimmett scenario and should end the inquiry. Do they stand on equal footing? Admittedly, Your Honor, no. Here you have an examining source. However, an additional case that I cited in my 28-J letter goes to show that an ALJ can rely on a non-examining source in a scenario like this when it is supported by substantial evidence. And here you have the ALJ... And here the ALJ relied primarily on the non-examining and his own sort of impressionistic, perhaps experiential involvement in prior cases. That raises a question in my mind. Yes, Your Honor, I understand that concern. Here, though, I think the ALJ did two things. He relied on the state agency opinion because that doctor is an expert and can evaluate this evidence. So that takes us out of the realm of Grimmett. But then the ALJ does go on to give about a page worth of analysis as to why, not only why, substantial evidence does not support this, but that same language is used to... is reflective of why substantial evidence supports what the state agency physician said. Now, in these Social Security cases, there's often arguments that ALJs are interpreting raw medical data because they're not medical experts, they're laypeople. However, we can't ignore the fact that ALJs are in the role to interpret evidence. They have to be able to weigh some things. And here, when the ALJ was relying on his own personal experience and his own analysis of the record, I don't think that the ALJ did anything that was impermissible or wanted into the realm of exercising medical expertise by a layperson. For example, the ALJ actually rejected one part of the non-examining state agency source's opinion regarding limitations in social functioning. And in doing that, the ALJ cited to evidence about how well this individual functions socially, the fact that he has a girlfriend, the fact that he socializes with his neighbours, etc. So that doesn't require any medical expertise to draw that inference from the record. And I think that where Mr. Guyton is alleging that this is all that the ALJ did was exercise his own impermissible medical expertise, I don't think that that is a fair reading of what the ALJ did in his decision. So unless there are any additional questions, I rest on our brief. Thank you very much. Thank you very much. Mr. Phillips, you've got some time in rebuttal. Thank you, Your Honours. Let's see. Responding to a few points that Mr. Valencia has raised. Number one, Mr. Valencia has said that Mr. Guyton lived with relatives because of his seizures. Well, most of the adaptive deficits that we have shown in the brief  And even when he did live alone, we've still shown that his friends and family were checking on him daily to help him make decisions, which has nothing to do with seizures, to help him use his ATM card. Mr. Valencia said he could use it. The evidence shows he can use it with help. That he can go shopping, but he can't decide what to buy. He needs help making a shopping list. So most of these things have nothing to do with seizures. Mr. Valencia says that the adaptive deficits in 1205C mean something different from the adaptive deficits in the DSM-IV-TR. Well, the professional definitions, as we explained in the brief, essentially set a higher bar, and Social Security sets a somewhat lower bar for adaptive deficits. So if you clear the higher bar of the professional definition, you have necessarily cleared the lower bar of Social Security. And in the Federal Register, which is cited in the brief, Social Security said that we allow claimants to use any of the professional definitions. And that includes the DSM-IV-TR, which is the 2 of 11 areas approach, and the American Association on Intellectual and Developmental Disabilities approach, which at the time of this decision required 2 of 10 areas, and the only difference between them was health and safety was one area, under the AAIDD criteria, and health and safety were two separate areas under the DSM-IV-TR. The other nine areas were the same, or the other 10 areas. So Social Security has said you can use the professional definitions, and for reasons shown in the brief, the Social Security definition is a little easier to meet. The argument on Mr. Bevis and his functional limitations, we are happy for the court to rely on Gordon. In fact, we cited Gordon, I think, 4 or 5 times in our reply brief. It helps Mr. Guyton in two ways. Number one, Gordon says that where the ALJ has not evaluated all of the relevant evidence, that a reviewing court cannot say whether the decision is supported by substantial evidence. And we've shown evidence of adaptive deficits in nine areas that this ALJ just didn't evaluate. And Gordon also says, on the other point, that the opinion of a non-examining doctor can be substantial evidence where the examining sources go both ways. And here that's not the case. Here the only examining source is Mr. Bevis, and his opinion was, of course, co-signed by Dr. Fiore. And they agree on the limitations that they set out, and there isn't any contrary evidence from any examining source. Is there a particular reason there's not an examining source on the other side? Your Honor, I was not administrative counsel, I don't know, but we have opinions from the treating neurologist, neurosurgeon, about his anxiety, and we haven't raised that as an issue, but that was there in the evidence. And, of course, there isn't any treatment for mental retardation, so you wouldn't be seeing a treating doctor to treat your mental retardation because there's just nothing they could do about it. On the job numbers issue, I think the government's argument is essentially the sky is falling, and I don't think that is correct. We're not asking for necessarily a printed source for every job number, but we are asking for some kind of replicable, checkable, explicable rationale for how you get from a printed source to the numbers in the testimony, and we don't have that here. As I said, the Supreme Court has held that due process allows, ensures that claimants can cross-examine expert witnesses, and if the answers don't matter, then the right to cross-examination doesn't matter. Is there anything else that you would like me to address? Thank you very much. Thank you very much for your time and attention. We'll come down and greet counsel, and we're going to take a very brief recess,
judges: G. Steven Agee, Andre M. Davis, Albert Diaz